UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TYSHEEM CROCKER,                        :
                                        :
              Petitioner,               :
                                        :        CIVIL NO. 3:CV-03-1718
        v.                              :
                                        :        (JUDGE VANASKIE)
EDWARD J. KLEM,                         :
                                        :
              Respondent.               :


M E M O R A N D U M

I.      Introduction

        Tysheem Crocker is a state prisoner proceeding through counsel on an

application for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Crocker challenges

a 1999 murder conviction in the Court of Common Pleas of York County, Pennsylvania.  He

raises several claims of ineffectiveness of counsel, trial court error, and insufficiency of the

evidence.  After careful consideration of the entire record and the applicable law, the petition

will be denied, as will Crocker's two pending motions for discovery.

II.     Factual Background

        In January of 1999, Crocker and co-defendant Melvin Bethune, Jr., were tried

before a jury on charges of first degree murder and criminal conspiracy in the October 5, 1997

shooting death of Raymond Clark.  Crocker acknowledges that the Pennsylvania Superior

Court opinion addressing his appeal from the denial of his first petition under the Pennsylvania

Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541, et seq., "fairly summarizes the

prosecution and defense evidence from the trial." (Doc. 11, Crocker's Supplemental Habeas

Brief, at R. 5.[1])  As the Superior Court reported:

> [Crocker] and Melvin Bethune were members of a gang in the
> York, Pennsylvania, area called "The Cream Team."  Also in the
> York area was a rival gang called "The Gods."  On October 5,
> 1997, following a dispute between the two groups, [Crocker] and
> Bethune traveled from York to New York to recruit manpower in
> order to retaliate against members of The Gods.  The motivation
> for the retaliation was the members of The Gods had assaulted
> Bethune earlier that day.
>
> [Crocker] and Bethune returned from New York with three
> individuals, including a man named "Corleone."  This group and
> fellow Cream Team member Danny Steele ("Steele") went to the
> Super 8 Motel in York to plan the assault.  The men decided they
> would shoot "Do-Work," who was the head of The Gods and
> whomever was with him.  They planned to attack The Gods at its
> usual hang out on Maple Street.
>
> [Crocker] and the others left the motel and drove to Maple Street.
> They parked their car and entered a home on Maple Street where
> they had stored guns.  They retrieved their guns and proceeded to
> a corner where they had been advised members of The Gods were
> playing dice.  Do-Work was playing dice along with a number of
> people including Raymond Clark ("Clark").
>
> [Crocker] and his co-conspirators approached. [Crocker] drew a
> gun on Do-Work and stated, "What's up now, yo?"  N.T. Trial,
> 1/11/99, at 54. [Crocker] attempted to fire his gun at Do-Work, but

---

[1]  The designation "R." or "RR." indicates the CM/ECF pagination of the document cited.

it jammed.  Immediately thereafter, other members of The Cream Team began firing at the people playing dice.  The dice players ran, and [Crocker's] group chased them.

Steele, Corleone, and another unnamed co-conspirator chased Clark.  Corleone shot Clark twice, fatally wounding him.  Do-Work escaped. [Crocker], Steele, and Bethune were all identified by witnesses as having been involved in the shootings and were arrested.  Steele agreed to testify for the Commonwealth in return for unspecified consideration in the criminal proceedings against him. . . .

At trial, [Crocker] testified in his own defense as follows.  He has been friends with Steele and his co-defendant Bethune, for at least 10 years.  He was part of a group called "The Cream Team," but they were not a gang.  Earlier in the day on October 5, 1997, The Gods surrounded a house where The Cream Team was staying. [Crocker] ran out of the back of the house because The Gods were carrying guns.  Later, Bethune stated that he had been attacked from behind, and that he did not see who did it. [Crocker] stated that he had an idea who it was, and that he was going to talk to Do-Work to get rid of the problem.  He and Bethune drove to New York City, went shopping for approximately an hour on Canal Street, and arrived back in York at approximately 10:00 or 10:30 that night.  In total, [Crocker] spent between six and eight hours on the road to do one hour of shopping.

When [Crocker] arrived back in York, Steele told him that Steele was having problems with Do-Work.  Steele was very agitated, and said that he had guns in a third party's house. [Crocker] stated that he could talk to Do-Work without guns.  Nevertheless, he retrieved a gun from the house and approached Do-Work.  Do-Work walked toward [Crocker], and they met on a corner. [Crocker] did not see anyone else during his conversation with Do-Work.  A few words were exchanged between [Crocker] and Do-Work, but [Crocker] did not draw a gun. [Crocker] heard gunshots from an unknown source, ran away, and left the gun near a fence.  At first, [Crocker] stated that he knew the gun was broken as he approached Do-

-3-

> Work, but later he testified that he did not know the gun was
> broken until after he ran away from the gunshots.  At one point,
> [Crocker] began to say that the gun 'jammed,' but later he stated
> that he simply knew the gun was broken.  He did not go to the
> motel before this incident took place.  He did, however, go to the
> motel after midnight on the night of the shooting.

((Doc. 18-2, App. A,  Commonwealth v. Crocker, No. 1392 MDA 2001 (Pa. Super. Aug. 12, 2002), RR. 2-5).

III.    Procedural History

On January 15, 1999, the jury found Crocker and Bethune guilty of first degree murder and criminal conspiracy to commit murder.  Both were later sentenced to life imprisonment for the first degree murder conviction and a concurrent term of 20 to 40 years on the conspiracy charge.[2]  Following the denial of post-sentence motions, Crocker filed a direct appeal.  By opinion dated April 21, 1999, the trial court issued an opinion pursuant to Pa. R. App. 1925(a), finding all issues presented on appeal to be without merit.  (Doc. 36-5, RR. 56-71).  The Superior Court affirmed the judgment of conviction on December 16, 1999.  (See Doc. 36-6, Commonwealth v. Crocker, 750 A.2d 366 (Pa. Super. 1999)(Table, No. 00483 MDA 99)).  The Pennsylvania Supreme Court denied allowance of appeal on September 5, 2000. Commonwealth v. Crocker,  761 A.2d 548, 563 Pa. 698 (Pa. Sept. 5, 2000).  Crocker did not

-----

[2] Bethune filed in this Court a separate habeas petition, which the Hon. Edwin M. Kosik denied by Memorandum and Order dated November 19, 2004.  (Bethune v. Vaughn, No. 3:03-CV-1667, Doc. 10.)  The Court of Appeals declined to grant Bethune a certificate of appealability in an order dated May 25, 2005.  (Id., Doc. 17.)

seek a writ of certiorari from the United States Supreme Court.

On September 14, 2000, Crocker commenced the first of three proceedings under the PCRA.  Counsel was appointed to represent Crocker.  The trial court, now serving as the PCRA court, held an evidentiary hearing on March 2, 2001, at which Crocker raised, inter alia, two ineffective assistance of counsel claims:  (1) counsel's failure to investigate the issue of when the motel room (where the criminal conspiracy allegedly took place) was rented; and (2) counsel's failure to interview and call at trial two known witnesses to testify that Crocker did not travel to New York City, as alleged, to recruit someone to commit the murder.  Crocker also presented a "new evidence" claim that Steele, the Commonwealth's main witness, testified in error at trial when he stated that the meeting in the motel room took place prior to the murder.  Crocker's trial counsel and Danny Steele also testified.  After hearing the evidence, the PCRA court issued an order from the bench dismissing the petition.  (See Doc. 18-2, App. C at RR. 24-65.)  Crocker failed to file a timely appeal.

Crocker then filed a second PCRA petition seeking to reinstate his PCRA appellate rights as his lawyer had failed to file an appeal.  Crocker's appeal rights were reinstated on July 20, 2001, and new counsel was appointed and filed an appeal on August 15, 2001.  (See Doc. 18-2, App. A at RR. 1-19.)  The Superior Court affirmed the PCRA court's decision on August 12, 2002.  (Id.)

On May 15, 2003, Crocker filed his third PCRA petition, asserting the discovery

of new evidence in the form of Steele's sentencing transcript.  (Doc. 24, Traverse, Ex. at RR. 8

-10.)  On June 11, 2003, the PCRA court dismissed the petition as untimely.  (Id.)  Crocker took

an appeal to the Superior Court, raising the following issues:

> (1) Is [Crocker] entitled to a new trial based upon prosecutor (sic) misconduct that the Commonwealth failed to disclose and actively concealed a plea agreement with its chief witness, Danny Steele, in exchange for Steele's favorable testimony?
>
> (2) Is Crocker entitled to a new trial based upon newly-discovered evidence that conclusively proves he did not rent a motel room at the asserted time and therefore did not enter into a conspiracy prior to the shooting?
>
> (3) Is Crocker entitled to a new trial because all prior counsels [sic] rendered ineffective assistance such that a miscarriage of justice is shown?

(Doc. 18-2, App. B at RR. 22-23, Commonwealth v. Crocker, No. 1104 MDA 2003 (Pa. Super.

May 11, 2004).  The Superior Court affirmed the PCRA court's determination that Crocker's

claim concerning Steele's plea agreement was untimely.  The Superior Court also found that

the motel check-in issue had been waived because it was not presented to the trial court, but

was instead asserted for the first time on appeal.  Crocker's petition for allowance of appeal to

the Supreme Court of Pennsylvania was denied on January 20, 2005.  See Commonwealth v.

Crocker, 868 A.2d 1197 (Pa. Jan. 20, 2005).

On September 29, 2003, Crocker, proceeding pro se, commenced this habeas

corpus action in this Court without awaiting the conclusion of the state court consideration of his

third PCRA petition.  This Court stayed the case pursuant to Crews v. Horn,  360 F.3d 146 (3d Cir. 2004), as the petition was timely but contained exhausted and unexhausted claims that were the subject of his third PCRA petition.  The stay was lifted after the Pennsylvania Supreme Court denied review of Crocker's third PCRA petition.  (Doc. 12.)   Respondent answered the Petition on April 25, 2005.  (Doc. 18.)  Crocker filed a Traverse on June 13, 2005.  (Doc. 24.)  A month later, Crocker filed a motion for appointment of counsel, which was denied without prejudice.  (Doc. 26.) Crocker then obtained private counsel who sought, and received, permission to file an amended habeas corpus petition.

An amended habeas petition was filed on June 7, 2007, raising the following seven claims: (1) trial counsel was ineffective in failing to properly investigate the Commonwealth's contention as to when Crocker rented the motel room where the conspiracy to kill the leader of a rival gang was hatched and which formed the basis for the conspiracy and first degree murder charges against Crocker; (2) trial counsel was ineffective for failing to interview and produce for trial two known witnesses who would have testified that they accompanied Crocker on his shopping trip to New York City; (3) trial counsel was ineffective for failing to object to the jury instruction on character evidence; (4) trial counsel was ineffective for failing to object to or request clarification of the Commonwealth's characterization of their plea agreement with Danny Steele; (5) the trial court's jury instruction on specific intent, particularly in the context of transferred intent, permitted a finding of guilt without finding beyond a reasonable doubt that

Crocker had the specific intent to kill; (6) insufficiency of the evidence to prove specific intent to kill; and (7) insufficiency of the evidence to prove the elements of accomplice liability. (Doc. 35.) Respondent filed an Amended Response to the Petition for Writ of Habeas Corpus. (Doc. 38.) Crocker did not file an Amended Traverse.

Also presently pending before this Court are two similar discovery motions filed by Crocker. (Docs. 39 and 40.) Specifically, Crocker seeks to take the deposition of Teri Flinchbaugh, the desk clerk on duty the evening Crocker checked into the Super 8 Motel under the alias of Shondle Shambles. Crocker claims that a "statement recently obtained by Petitioner's investigators" confirms that Ms. Flinchbaugh checked Crocker into the hotel during her shift between 11:00 p.m. and 7:00 a.m., i.e., after the fatal shooting. (Doc. 39, Discovery Request at R. 5, ¶ 21.) Crocker argues that requested discovery will conclusively prove Crocker did not check into the Super 8 Motel until after Clark's murder. (Id.)

IV.    Standard of Review

A prisoner filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254 must first exhaust all state remedies prior to federal court review. See 28 U.S.C. § 2254(b)(1). Review of a claim for relief adjudicated on the merits by the state courts is limited to determining whether the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. Williams v. Taylor, 529 U.S. 362, 405 (2000); Outten v. Kearney, 464 F.3d 401, 413 (3d Cir. 2006).

To label a state court decision "contrary to" clearly established United States Supreme Court precedent, the state court must have reached "a conclusion opposite to that reached by the [Supreme Court] on a question of law or . . . decides a case differently than the [Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. An "unreasonable application" results where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08. Stated otherwise, a state court decision is an unreasonable application under § 2254(d)(1) if the state court "either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002). Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams, 529 U.S. at 411.

A federal court may also grant relief under 28 U.S.C. § 2254(d)(2) where the state court based its decision on an "unreasonable determination of the facts in light of the evidence presented in the State court proceedings." However, pursuant to "28 U.S.C. § 2254(e)(1), a federal court is required to presume that a state court's determinations of factual issues are correct," and a habeas petitioner must present clear and convincing evidence to rebut the presumption of correctness. See 28 U.S.C. §2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact. Campbell v. Vaughn, 209 F.3d 280, 286 (3d Cir. 2000). Consequently, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

Similar to the "unreasonable application" prong of § 2254(d)(1), a factual determination should be adjudged "unreasonable" under § 2254(d)(2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record. See 28 U.S.C. § 2254(d)(2); Porter v. Horn, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003). "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction." Breighner v. Chesney, 301 F. Supp. 2d 354, 364 (M.D. Pa. 2004) Mere disagreement with a credibility judgment or inference drawn by the state court is insufficient to permit relief. Porter, 276 F. Supp. 2d at 296. Only when the finding lacks

evidentiary support in the state court record, or is plainly controverted by other evidence, should the federal habeas court overturn a state court's factual determination.  Id. at 296

V.      Discussion

        A.      Ineffective Assistance of Counsel Claims

        A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 686-687 (1984).  An ineffective assistance of counsel claim has two components: 1) counsel's performance fell below an objective standard of reasonableness; and 2) counsel's deficient performance actually prejudiced the petitioner's case.  Id. The petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  Where an error by counsel has no effect on the judgment a petitioner's claim must fail.  Id. at 691  It is the petitioner's burden to establish both deficient performance and resulting prejudice.  Id. at 687.  "A court can choose to address the prejudice prong before the ineffectiveness prong and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced."  Rolan v. Vaughn, 445 F.3d 671, 678 (3d. Cir. 2006)

        Where state courts have considered a claim for ineffective assistance of counsel, the federal court's review of the claim is governed by 28 U.S.C. § 2254(d)(1).  Thus, a federal court does not render an independent judgment, but rather determines whether the state court

decision is contrary to or involved an unreasonable application of the Strickland test.  See

Rompilla v. Horn, 545 U.S. 374, 380 (2005).

           1.      Trial Counsel's Failure to Investigate Crocker's Check-
                  In Time at the Motel

Steele's trial testimony indicated that Crocker, Bethune, Steele, and the New

York support met at a local motel prior to the fatal encounter with Do Work and his gang.

Steele testified that it was during this meeting that the group agreed to shoot Do Work and

anyone with him.  As corroboration for Steele's testimony, the prosecutor presented evidence

from the Manager of the Super 8 Motel that a person using a name shown to have been used

by Crocker, Shondle Shambles, checked into the motel on the night of the murder.

Crocker testified at trial that he did not check into the motel until after the

shooting.  He argues that an adequate investigation by trial counsel would have confirmed his

testimony.

Defense "counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness

case, a particular decision not to investigate must be directly assessed for reasonableness in all

the circumstances, applying a heavy measure of deference to counsel's judgments."

Strickland, 466 U.S. at 690-691.

The Pennsylvania Superior Court denied relief on this claim, stating:

           According to [Crocker], the motel has a policy where

-12-

people who check-in after midnight are deemed to
have checked-in on the previous night. [Crocker]
argues that this policy is significant because the
Commonwealth presented evidence that [Crocker]
checked into the motel on October 5, 1997, the night
of the murder.  This evidence supported the
Commonwealth's claim that [Crocker] checked into
the hotel in the evening hours of October 5, 1997, to
plan the murder with his associates before the
shooting took place.  According to [Crocker], he did
not check in until after midnight on October 6, 1997,
several hours after the shooting.  Thus, the hotel's
check-in policy could have explained the discrepancy
between [Crocker's] testimony and the hotel's record
that he checked in on October 5.  According to
[Crocker], counsel's failure to investigate this matter
constituted ineffectiveness.

The PCRA court found that counsel was not
ineffective because the check-in policy would not
have had significant value to the defense.
Specifically, the policy "simply didn't show one way
or the other when the defendant was actually there."
PCRA Court Opinion, 3/2/2001, at 5.  We see no
abuse of discretion.  Even if [Crocker] had presented
evidence of the check in policy, it would have shed
no light on whose version of the events was
accurate.  The policy would have equally supported
the Commonwealth's position that [Crocker]
checked-in on the evening of October 5th, and
[Crocker's] position that he checked in on the early
morning of October 6th.  In other words, the
proffered evidence would not have created a
reasonable probability that the outcome of the case
would have been different.  Thus assuming the issue
had arguable merit and assuming that counsel had
no reasonable basis for failing to present this
evidence, [Crocker] has failed to show prejudice.

-13-

(Doc. 18-2, App. A  at RR. 13-14.)

The state courts' decisions were neither contrary to nor an unreasonable application of Strickland.  Nor do they reflect an unreasonable determination of the facts. Based upon the record before the state courts on the first PCRA determination, evidence as to the motel's treatment of check in dates would not have shown whether Crocker checked into the motel before or after the murder.  Thus, the state courts' determinations are plainly rational, and Crocker is not entitled to habeas relief on this ground.

Crocker asserts that additional evidence obtained after the adjudication of his first PCRA petition now establishes definitively that he did not check into the motel room before the homicide.  Crocker presented the claim of newly discovered evidence relative to the rental of the motel room for the first time in his appeal of the dismissal of his third PCRA petition. Finding the claim was never presented to the PCRA court, the Superior Court of Pennsylvania held Crocker waived the claim.  (Doc. 18-2, Appendix B, Commonwealth v. Crocker, No. 1104 MDA 2003 (Pa. Super. May 11, 2004)(unpublished opinion) at RR. 29-30).

When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state court remedies are still available, or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted.  Bronshtein v. Horn, 404 F.3d 700, 707 (3d Cir. 2005).  In this case, the Pennsylvania Superior Court applied

-14-

the well established principle that a claim for post-conviction relief cannot be raised for the first time on appeal.  See Pa. R. App. P. 302(a) ("issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

A federal court may reach the merits of procedurally defaulted claims only where the petitioner can demonstrate either "cause and prejudice" for his procedural default, or that a fundamental miscarriage of justice would result if his claim was not reviewed.  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Lines v. Larkins, 208 F.3d 153, 166 (3d Cir. 2000); Wenger v. Frank, 266 F.3d 218, 225 (3d Cir. 2001).  To satisfy the first exception, the petitioner must show: (1) cause for his failure to raise his claim in state court; and (2) prejudice to his case as a result of that failure.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To demonstrate "cause" for a procedural default, the petitioner must show that something "external" to the defense impeded petitioner's efforts to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986).  Once "cause" has been successfully demonstrated, petitioner must then prove "prejudice."  Prejudice must be something that "worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Id. at 494.

Alternatively, a federal court may excuse procedural default when the petitioner establishes that failure to review the claim will result in a fundamental miscarriage of justice. See Werts v. Vaughn, 228 F.3d 178, 192 - 193 (3d Cir. 2000).  A credible allegation of actual

-15-

innocence constitutes a "miscarriage of justice" that enables courts to hear the merits of otherwise procedurally defaulted habeas claims.  Hubbard v. Pinchak, 378 F.3d 333, 338 (3d Cir. 2004).  The fundamental miscarriage of justice exception, as defined by the United States Supreme Court, is confined to cases of actual innocence as compared to legal innocence, where the petitioner can show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence.  Schlup v. Delo, 513 U.S. 298, 327 (1995).  To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial.  Id. at 324.

In the instant case, Crocker has not shown either cause and prejudice, or that a fundamental miscarriage of justice will result if this Court does not excuse the procedural default of his claim of newly discovered evidence as to the timing of the rental of the motel room.  Crocker was aware of the potential discovery of additional information relative to pinpointing the exact time he checked into the Super 8 motel room when he raised it in his first PCRA petition under the guise of an ineffective assistance of counsel claim.  Furthermore, prior to the filing of the May 15, 2003, PCRA petition, Crocker himself, and subsequently his appellate PCRA counsel, had undertaken efforts to pursue discovery on the issue of the rental of the motel room.  Specifically, as demonstrated within the record, there is a December 5, 2002, letter from Crocker's private investigator to Crocker indicating the need for a court order to speak with present or former hotel employees.  (See Doc. 36-11 at RR. 6-7.)  Five months

-16-

later, Crocker's appellate PCRA counsel drafted a subpoena duces tecum to the Super 8 motel authorities seeking guest records for the night in question; names and addresses of the clerks on duty the evening in question; and a copy of the motel's check in policies or procedures. (See Doc. 36-11 at R. 8.)  Crocker's counsel received a response to the subpoena dated May 16, 2003, one day after counsel filed Crocker's third PCRA.  (See Doc. 36-11 at R. 9.)  Time sheets for the clerks on duty the nights of October 5th and 6th were presented as well as a copy of the hotel's check-in procedures.  (Id.)  Additionally, a night audit report is in the record.  (Id. at 4.)  No evidence has been presented to show why this information could not have been obtained when the first PCRA petition was pending.  No explanation has been given for why it was not raised in the third PCRA petition.  Based on the record, Crocker cannot demonstrate cause for failing to present his claim of newly discovered evidence relevant to his rental of the Super 8 motel to the state court prior to reaching federal court.

Nor can Crocker show a miscarriage of justice if this aspect of the ineffective assistance claim is not adjudicated.  Assuming that Crocker did not rent a motel room prior to the murder, it does not follow that there was no meeting prior to the murder during which his gang members agreed that anyone in the company of Do Work would be in mortal jeopardy. Steele did not testify that the conspirators met in a room rented by Crocker, and there were other conspirators from outside York.  The fact that Crocker did not register at the motel before the murder does not mean that others in his gang did not register before the murder.

Moreover, there was corroborative evidence of Crocker's intention to commit murder on the night in question, including evidence that the conspirators were assured that Do Work was engaged in a dice game in the vicinity of the murder; Crocker was armed and pointed his gun at Do Work's head; and that Crocker pulled the trigger, only to have the firing mechanism jam. Under these circumstances, the jury had ample evidence to convict Crocker regardless of when he rented the motel room in question.[3]

　　　　　2.　　　Trial Counsel's Failure to Interview and Call Two Witnesses to Verify that Crocker did not Go to New York to Recruit Manpower for the Purpose of Committing Murder

　　　　　At trial, the prosecution argued, aided by the testimony of Danny Steele, that Crocker went to New York City to recruit manpower in anticipation of carrying out the retaliatory strike against The Gods.  Crocker admitted going to New York after Bethune was assaulted and returning the same day, but claims he rented a car and made the six to eight hour round trip for the purpose of doing one hour's worth of shopping.  Crocker claims his trial counsel's failure to interview or call Raveena Beatty and Latoya Beatty as witnesses to testify in support of his reasons for going to New York City on October 5, 1997, constitutes ineffectiveness of counsel.[4]  (Doc. 35 at R. 11.)

---

　　　　　[3] In light of this determination, Crocker's motions for discovery on the rental of the motel room will be dismissed.

　　　　　[4] It should be noted that Crocker's trial testimony did not indicate that the Beattys

(continued...)

Crocker presented this claim for review to the Superior Court via his appeal of the denial of his first PCRA petition.  The state court noted that although neither witness testified at the PCRA proceedings, the parties stipulated that they would have testified to accompanying Crocker to New York and going shopping on Canal Street.  (Doc. 18-2, App. C at RR. 111 - 113.)[5]

Crocker's trial counsel did not recall whether he tried to find corroborating evidence to support Crocker's claim that he went to New York to go shopping.  (Id. at R. 44.)  Trial counsel recalled Crocker's defense was: "(1) he had no intention of causing harm to anyone on the night in question; (2) he did not fire any shots or attempt to do so; and (3) he ran away from his discussion with Do-Work after hearing gunshots being fired at him."  (Doc. 18-2, App. C at RR. 44 - 45; Doc. 18-2, App. A.)  Although aware of the trip to New York, trial counsel "didn't think [it] had nearly as much relevance as to what happened at the scene."  (Doc. 18-2, App. C at R.45.)

The state court noted that Crocker testified to driving a considerable period of

---

[4](...continued)
accompanied him to New York on the alleged shopping excursion.  Crocker did testify, however, that Bethune went with him to the city.

[5]  Counsel stipulated that the witnesses "would have testified that they went to New York and they went for shopping on Canal Street and then came back."  (Doc. 18-2, App. C at RR. 111 - 112.)  There is no evidence to suggest that these witnesses would have also testified as to whether or not Crocker transported any additional individuals from New York City to York that day.

time to New York to do only one hour's worth of shopping just after a member of his gang had

been assaulted by The Gods and just before a member of his gang retaliated against The Gods

for the earlier assault.  The court found that the proffered testimony would have only been

cumulative of Crocker's.  Further, the court observed that given the timing of the New York trip,

the brevity of the shopping excursion, and Steele's testimony that Crocker went to New York to

recruit others for the purpose of retaliating against The Gods, counsel "was not ineffective

because focusing on the trip to New York would have only drawn undue attention to a

damaging aspect of [Crocker's] testimony."  (Doc. 18-2, App. A.)

   The state court's determination does not rest upon an unreasonable

determination of the facts.  Drawing attention to the New York trip, occurring as it did in the

immediate aftermath of a violent encounter between The Gods and Bethune, would only have

emphasized the planning that preceded the murder of Clark.

   Given the unsettled events of the days of hostilities between The Cream Team

and The Gods, the timing and the limited duration of Crocker's "shopping" trip, and Crocker's

armed confrontation with the leader of The Gods, when compared with the Commonwealth's

suggestion of the true nature of the whirlwind New York trip, trial counsel had ample reason to

avoid focusing attention on the purpose of the New York trip.  Crocker has not overcome the

presumption that the failure to pursue support for the avowed purpose of the six to eight hour

round trip to New York City might be considered sound strategy.  Jermyn v. Horn, 266 F.3d

-20-

257, 282 (3d Cir. 2001).

Further, even assuming counsel's failure to call the Beattys to testify was deficient performance, Crocker was not prejudiced by any failure to offer their testimony as the parties stipulated that their testimony would have been limited to the fact that they accompanied Crocker on his shopping trip to New York City and nothing more.  No stipulation was presented as to what these witnesses would have said with respect to whether others returned with them from New York City.  Moreover, there was substantial testimony that Crocker brought "muscle" with him as part of the planned confrontation with the rival gang.  Thus, the failure to present the testimony of these witnesses did not prejudice Crocker.  As a result, Crocker is not entitled to habeas corpus relief on this claim, and it will be denied.

3.     Trial Counsel's Failure to Object to the Court's
Jury Instruction Regarding Character Evidence

Crocker claims that his trial counsel was ineffective for failing to object to the trial court's "patently defective" instruction on character evidence.[6]  (Doc. 11 at R. 22.)

_____

[6] The trial judge gave the following jury instruction on character evidence:

There was a witness in regard to character reputation, I believe,
Mr. Crocker had a witness who testified about his reputation for
being peaceful and law-abiding, and she may have even
mentioned something about the other Defendant, as well.  You
may consider that as evidence on the Defendant's behalf, and that
reputation that they have for being a peaceful and law-abiding
citizen.  If you find that it is accurate, and you find that the witness

(continued...)

A habeas petitioner is entitled to relief on a due process challenge to erroneous jury instructions only if the petitioner shows: 1) there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution, Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997); and 2) the error was not harmless, i.e., that it had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638, (1993); Smith, 120 F.3d at 417.  In making this determination, the court must "consider the totality of the instructions and not a particular sentence or paragraph in isolation." United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir. 1995).  The instructions will be upheld if

---

[6](...continued)
>   actually has discussed it with other people, and you're satisfied that really does represent the feeling in the community, then you may say well, a person like that probably wouldn't be going around killing somebody or participating in these activities as an accomplice, and therefore, that person didn't do these things.
>
>   But in making that decision obviously you would look at all the circumstances.  There was other testimony in that case. Obviously, Danny Steele testified they do have a reputation for engaging in such conduct.  He said they're part of a crew, that they're dealing drugs, that they're robbing people, so he is saying there is testimony that they are known to have a reputation for bad acts.
>
>   It's up to you to weigh all the testimony and determine whether there is character reputation, what effect it has and [whether] it impacts on your verdict.

(Doc. 20-4, N.T. 1/11 - 15/99, RR. 59-60.)

"the charge as a whole fairly and adequately submits the issues in the case to the jury." United States v. Thayer, 201 F.3d 214, 221 (3d Cir. 1999)(quoting United States v. Zehrbach, 47 F.3d 1252, 1264 (3d Cir. 1995)).  "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

      In United States v. Spangler, 838 F.2d 85, 87 (3d Cir. 1988), the court held that a defendant is not entitled to an instruction that character evidence, standing alone, is sufficient to create a reasonable doubt.  The court explained that "so long as an instruction . . . is given, which calls the jury's attention to its duty to take character evidence into account with all of the other evidence in deciding whether the government has proved its charge beyond a reasonable doubt, the omission of the express 'standing alone' language . . . is not an abuse of the discretion vested in the trial court to choose the wording of the character evidence charge." Id. Furthermore, as long as the charge correctly recites the law and issues, the trial judge may employ whatever words and phrases he desires. United States v. Ruppel, 666 F.2d 261, 273 (5th Cir. 1982)("There is, of course, no ritualistic incantation or magic formula that the judge must recite in his charge on character evidence.")  Relief is available only if the instruction was capable of confusing and thereby misleading the jury. United States v. Rockwell, 781 F.2d 985, 991 (3d Cir. 1986) (citation omitted).  Moreover, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp, 414 U.S. at 146-47.

Crocker asserts two defects in the instruction on character evidence: (1) the failure to include the words "reasonable doubt" in the charge; and (2) the judge's direction to the jury that "[i]t's up to you to weigh all the testimony and determine whether there is character reputation, what effect it has and [whether] it impacts on your verdict." Crocker asserts that the instruction left the jurors without any standard. (Doc. 11, Memorandum in Support of Habeas Petition; Doc. 20-4, N.T. Trial 1/11 - 15/99, RR. 59 - 60.)

The omission of the words "reasonable doubt" from the instruction does not render the jury instruction unsound. Spangler, supra. Clearly, the language selected by the trial court allowed the jurors, if they elected to believe the positive character evidence presented, free to find that Crocker "didn't do these things." Furthermore, the challenged instruction, when viewed in the context of the entire jury charge, is not so erroneous as to deprive Crocker of his right to a fair jury trial. The trial court's charge clearly drew the jury's attention to its duty to properly consider the proffered character evidence within the context of the other testimony offered in the case.

The Superior Court reviewed the jury charge in Crocker's case under a standard consistent with precedents of the United States Supreme Court. See Doc. 18-2, App. A at RR. 11-12.[7]   The Superior Court's finding that the instruction "adequately and accurately

---

[7]   The Superior Court used the following standard of review:

(continued...)

instruct[ed] the jury on character evidence" was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.  Crocker's request for relief on this claim, therefore, will be denied.

> 4.    Trial Counsel's Failure to Object to or Request Clarification of the District Attorney's Characterization of the Nature of the Prosecution's Agreement with Danny Steele

Crocker claims trial counsel failed to object to, or request clarification of, the District Attorney's implication to the jury that Danny Steele was to receive the same sentence as Crocker.  This issue was presented in Crocker's first PCRA petition.  (Doc. 18-2, App. A.) The state court dismissed this claim of ineffectiveness of counsel on the basis that the underlying claim lacked merit.  (Id. at RR. 14 - 16.)

Crocker alleges that the following dialogue at trial between the Commonwealth and Steele relating to the deal reached with Steele in exchange for his testimony inaccurately

---

[7](...continued)
> A trial court has broad discretion in phrasing its points for charge, and is not bound to give instructions in the form requested.  A trial court need not accept counsel's wording but may choose its own so long as the 'area is adequately, accurately and clearly presented to the jury for their consideration.'  Further, an appellate evaluation of the charge must be based on an examination of the charge as a whole to determine whether it was fair or prejudicial.

(Id.)

suggested that Steele would receive the same sentence as Crocker:

> Q: Now as I said before, you pled guilty to criminal conspiracy to commit murder, is that correct?
>
> A: Yes.
>
> Q: That was a straight plea, which means you're going to be sentenced by the judge, is that correct?
>
> A: Yes.
>
> Q: What's your agreement with the Commonwealth in regards to your case, one of your charges was dismissed, is that correct?
>
> A: Yes.
>
> Q: And that was the actual murder charge?
>
> A: Yes. It was never really an agreement. It was just that if I testify, and testify against every one of the individuals, including Corleone, then it would be consideration, but it was nothing. Nothing was promised to me. Nothing was on paper, because I got conspiracy, so it ain't too much.
>
> Q: You understand that carries the same weight as-
>
> A: Yes carries-
>
> Q: -as the criminal murder charge?

(Doc. 18-2, App. A, citing Doc. 19-3 at RR. 80-81.)  Steele later testified, however, that the maximum prison term that could be imposed on him was twenty years, but that he hoped to receive "consideration" in exchange for his testimony.  As the Superior Court observed, Steele was cross-examined extensively on this matter, and indicated he hoped to receive a sentence

of 2 ½ to 5 years in the county prison.  During closing argument, Crocker's counsel pointed to the potential for Steele to receive a very lenient sentence as strong motivation to place the blame on Crocker.

It is clear that Crocker's trial counsel vigorously cross-examined Steele about his plea agreement with the Commonwealth in exchange for his testimony.  Crocker has failed to demonstrate that his trial counsel's questioning of Steele was deficient or in error.  On direct examination, Steele testified that he received a straight plea on the conspiracy to commit murder charge and that the first degree murder charge had been dropped in exchange for his trial testimony.  On cross-examination, Crocker's counsel elicited testimony that although Steele had not been promised any specific length of a sentence, he expected some consideration for his testimony, and that the sentence could be as short as 2 ½ to 5 years in county jail.[8]

In summary, the state counts had an ample factual foundation for the conclusion that Crocker's trial counsel acted well within the range of competence in pursuing Steele's motive to fabricate his testimony.  Crocker has not established that the state court's denial of this claim was either contrary to or an unreasonable application of <u>Strickland,</u> or resulted in a

---

[8]During the PCRA proceedings, Crocker did not present any evidence that the prosecutor had in fact agreed to a specific prison term prior to the outcome of the Crocker/Bethune trial.

decision that is based on an unreasonable determination of the facts.[9]

> B.  The Trial Court's Jury Instruction on the Doctrine
>     of Transferred Intent did not Violate Crocker's
>     Due Process Rights

In his direct appeal, Crocker asserted that the trial court's jury charge on transferred intent "misled the jury to believe that if Crocker went to the dice game intending to kill Do-Work, and Clark dies at another location moments later, Crocker is automatically guilty of Clark's death by transferred intent" because the judge "charged the jury on tort law in a murder case." See Doc. 36-5 at R. 2 and RR. 30-34.)  Crocker's trial counsel objected to the language of the jury instruction, arguing the judge did not "specify the correct relationship between conduct and result in a criminal case." (Doc. 36-6 at RR. 11-13.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Accordingly, a "jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of an offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights." Smith, 120 F.3d at 415.

---

[9]A similar claim presented by co-Defendant Bethune in the habeas petition filed in this Court was similarly found to be without merit.  Bethune v. Vaughn, No. 3:03-1667, Doc. 10 (M.D. Pa. (Nov. 19, 2004).

The Superior Court of Pennsylvania considered "[Crocker's] argument that the trial court erred in its presentation of the doctrine of transferred intent to the jury" in that the jury instruction "did not track precisely the language of Commonwealth v. Rementer, 598 A.3d 1300 (Pa. Super. 1991) or 18 Pa. C.S. § 303." (Doc. 36-6 at RR. 11-13.)   In particular, the Superior Court considered Crocker's assertion whether the "charge as presented did not allow the jury 'to consider whether Clark's death was so extraordinary, remote or attenuated that it would be unfair to hold [Crocker] criminally responsible for it.'" (Id. at 13.)   The Superior Court examined the following language of the charge to the jury regarding transferred intent:

> So you have to determine whether you're satisfied beyond a reasonable doubt that these Defendants engaged in a discussion, that as a result of that discussion there was an agreement, that the agreement was that a person was to be killed.
>
> Now, it doesn't matter either as to the charge of first degree murder or third degree murder, that it be the same person who dies that was the object of the conspiracy.  So it should go back – – you may say well, yes, they conspired to murder somebody, in fact, it was Kendell Smith, Do-Work, and anybody else [who] happened to be there.   When you go back and look at the charges themselves, you can find that specific intent to kill applies, even though it was somebody else that was killed.  It [is] what the law calls transferred intent.  If you intended to kill somebody and you fired shots and you end up causing somebody else's death, that specific intent that you had transfers over and applies to the person who was actually killed.
>
> So when you're looking at guilt or innocence of first degree murder and third degree murder, you would be finding did they plan to kill somebody, in this case apparently Do-Work, according to the Commonwealth's testimony, and then did somebody actually die?

> And you would use that transferred intent.
>
> And the specific intent can come from the intent to kill the original person, and then be applied, by transferred intent to the one that actually died.

(Doc. 36-6 at RR. 11-12; see also Doc. 20-4 at RR. 17 and 18.)  After examining the language of the charge, the state court found it did not prevent the jury from considering whether the killing of Clark was so remote or attenuated that it would be unfair to hold Crocker criminally responsible for it.  The Superior Court also reasoned that, even if the charge was unduly restrictive, any error was harmless because of the wealth of evidence supporting the proposition that there was an intent to kill Do-Work as well as anyone with him.  (Id.)

Under Pennsylvania law, first degree murder requires the specific intent to kill the victim.  18 Pa. Cons. Stat. Ann. § 2505.  This specific intent, however, may be transferred to an unintended victim.  18 Pa. Cons. Stat. Ann. § 303(b).  See also Commonwealth v. Jones, 912 A.2d 268, 288-89 (Pa. 2006).  The trial court's instruction regarding transferred intent was in accordance with this law.  (See Doc. 20-4, N.T. 1/11/99 - 1/15/99, at RR. 15 - 18.)

Furthermore, contrary to Crocker's argument, the trial judge adequately instructed the jury on the defense contention that the passage of time between Crocker's encounter with Do Work and the shooting of Clark precluded a finding of specific intent.  After discussion with counsel, the judge gave the following additional instruction:

> There is a possibility that I didn't discuss in regard to the gap or the separation in time, between the shootings.  It is possible that you

could find that there was a series of events which occurred right at the dice game, and that perhaps even that the Defendants participated in some conspiracy or agreement or accomplice situation in regard to that, but then there was a break in the action, the agreement ceased, some persons went off on their own, and at another location a block away, separated by some number of minutes, that the shooter then fired shots, not as part of that original agreement, but as a part of a new separate action, and which only the three people that were there were part of, or only the shooter alone was part of, and not everybody who had come to the scene or who was back at the dice game or doing whatever they did. . . .

So, you should look at the gap, determine how much of a gap was it, how far was it removed in time, how far was it removed in distance, how far was it removed in terms of who participated, and do you find that to be a separate and distant act from what happened back at the dice game.  And let your verdict flow from that in regard to whether the Defendants were part of an agreement or conspiracy in regard to the shooting, which occurred at the far end of the happening in regard to time and location.

(Doc. 20-4 at RR. 61-62.)

Clearly, when evaluating the entire jury charge on transferred intent, the trial court articulated the appropriate legal principles.  Additionally, the court set forth various possible factual scenarios, as requested by defense counsel, for the jury to consider as to when the conspiracy could have been formed, and when it could have ceased, which included the possibility that the conspiracy ended prior to Clark being shot.

Crocker's co-Defendant presented the same challenge to the charge on transferred intent, and Judge Kosik rejected it.  Bethune v. Vaughn, Civil Action No. 3:03-1667,

-31-

(M.D. Pa. Nov. 19, 2004).  As noted above, the Third Circuit denied Bethune a certificate of appealability.  Under these circumstances, no rational jurist could find that the state court's decision was contrary to or an unreasonable application of Supreme Court precedent. Accordingly, Crocker is not entitled to relief on this ground.

### C.      Sufficiency of the Evidence to Support the a Finding that Crocker Had a Specific Intent to Kill

Crocker's last two claims rest upon his assertion of an "evidentiary void" as to specific intent and accomplice liability.  (See Doc. 37 at R. 14.)  According to Crocker, "the evidence would not support a conviction of reckless endangerment, let alone a conviction of first degree murder for the death some distance away and after the shooting had stopped of an individual who seems to have been shot in cold blood for no reason at all." (Id.)

A criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in Jackson v. Virginia, 443 U.S. 307 (1979).  Under Jackson, the federal court is to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Federal review of a sufficiency of the evidence claim under Jackson must be based upon state law, that is, the substantive elements of the crime as defined by applicable state law.  Id. at

324 n. 16. The credibility of witnesses, the resolution of conflicts of evidence, and the drawing of reasonable inferences from proven facts all fall within the exclusive province of the fact finder and, therefore, are beyond the scope of federal habeas review. Id. at 309; see also Johnson v. Mechling, 541 F. Supp. 2d 651, 666-67 (M.D. Pa. 2008).

        The state court applied a sufficiency of evidence standard that is indistinguishable from the Jackson standard.  (Doc. 36-6, Commonwealth v. Crocker, 750 A.2d 366 (Pa. Super. 1999)(Table, No. 00483 MDA 99) at R. 9.)   It found the evidence sufficient to support the jury verdict, and Crocker has made no showing that this determination rests upon an unreasonable determination of the facts.  In this regard, it bears reiteration that the fact that Crocker did not register at the Super 8 motel until after the murder does not mean that no meeting occurred prior to the murder.  The evidence certainly suggests a planned armed confrontation where violence was intended.  Moreover, Steele's testimony that there was an understanding that Do Work would be killed as well as anyone else was not rebutted.  Under these circumstances, Crocker has not carried his heavy burden of showing factual or legal error by the state court.

VI.    Conclusion

        Crocker, although well represented by counsel, has failed to show an arguable entitlement to habeas corpus relief.  As noted above, both this Court and the Court of Appeals for the Third Circuit found that Crocker's co-Defendant failed to provide any basis for habeas

-33-

relief.  Accordingly, the petition for a writ of habeas corpus will be denied and a certificate of

appealability will be refused.[10]   An appropriate Order follows.


                                        s/ Thomas I. Vanaskie
                                        Thomas I. Vanaskie
                                        United States District Judge

---

[10]Crocker is advised that he has the right to appeal the order denying his petition, see 28 U.S.C. § 2253(a), and that the denial of a certificate of appealability does not prevent him from doing so, as long as he seeks a certificate of appealability from the Court of Appeals.  See Fed. R. App. P. 22.  Any notice of appeal must be filed within thirty days of the entry of the Order denying the habeas petition and refusing to issue the certificate of appealability.  Fed. R. App. P. 4(a)(1)(A).

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TYSHEEM CROCKER,                          :
                                          :
                    Crocker,              :
                                          :   CIVIL NO. 3:CV-03-1718
              v.                          :
                                          :   (CHIEF JUDGE VANASKIE)
EDWARD J. KLEM,                           :
                                          :
                    Respondent.           :


## O R D E R

NOW, THIS 9th DAY OF DECEMBER, 2008, for the reasons set forth in the

accompanying Memorandum, IT IS HEREBY ORDERED THAT:

1.    The petition for writ of habeas corpus is DENIED.

2.    Crocker's Motion for Discovery (Doc. 39) and
      Amended Motion for Discovery (Doc. 40) are
      DENIED.

3.    The Clerk of Court is directed to mark this matter
      CLOSED.

4.    Issuance of a certificate of appealability is
      REFUSED.

                                    s/ Thomas I. Vanaskie
                                    Thomas I. Vanaskie
                                    United States District Judge